**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry N. COOK, Defendant-Appellant.**

**No. 77–5497.**

United States Court of Appeals, Fifth Circuit.

May 19, 1978.

Gary D. Jackson, Emmett Colvin, Dallas, Tex., for defendant-appellant.

Kenneth J. Mighell, U. S. Atty., William O. Wuester, III, Raymond L. Betts, Jr., Asst. U. S. Attys., Fort Worth, Tex., Shirley Baccus-Lobel, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

After a plea of guilty, the appellant, Larry N. Cook, was convicted of fraud in the offer of sale of securities in violation of 15 U.S.C. §§ 77q(a), 77x, and 18 U.S.C. § 2, and of mail fraud in violation of 18 U.S.C. §§ 1341, 2. The trial judge sentenced Cook to five years' imprisonment for each offense.[1] On this appeal, Cook challenges only the jurisdiction of the trial court to impose a sentence for the securities count. Cook argues that the trial court lacked jurisdiction over the securities count because the alleged fraud was committed solely upon foreign investors and the fraud had no impact upon either the domestic markets or domestic investors.[2]

## I.

The indictment charged that Cook and his codefendants, while operating out of Dallas, Texas, defrauded European investors by operating a Ponzi scheme.[3] The heart of the scheme was the offer and sale of fractional undivided working interests in oil and gas wells located in the United States.

Cook and his codefendants would place false and misleading advertisements in various European newspapers and periodicals. The advertisements would extol the virtues of investments in American oil and would falsely promise high monetary gain. Specifically, in other sales material, Cook and his codefendants, promised a 39.8% annual return on Ohio oil wells, 47% return on Texas wells, 56% return on West Virginia wells, and a 39% return on Kentucky wells. These returns were supposedly based upon the production figures for operating American oil wells, however, the production figures were grossly misstated and the actual returns, if any, were far from the promised figure.

1. The sentences are consecutive.

2. Specifically, Cook alleges that the indictment failed to charge that (a) any fraudulent sale was made to a resident or citizen of the United States; (b) any trading of fraudulent securities occurred in or over any United States securities market; (c) the sale of the fraudulent securities had any effect upon the domestic securities market; or (d) there was any domestic injury from the sale of the fraudulent securities.

3. In a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture but are taken from the corpus of the newly attracted investments. The swindler then takes an appropriate time to abscond with the outstanding investments. As one author has described it, "he borrowed from Peter to pay Paul. And it worked . . . until Peter got wise."

The scheme is named after its most famous practitioner, Charles Ponzi. Ponzi was an Italian immigrant who successfully bilked an unwitting American public out of millions of dollars in a scheme involving international postal reply coupons. Ponzi ran his swindle from the heart of Boston's financial district and continued to run the scheme for about a year before his empire collapsed—all despite the fact that Ponzi knew little, if any, about international finance. Ponzi was eventually sentenced to prison and upon his release he was deported to Italy where the dictator Mussolini gave him a job in the finance ministry. Proving that swindle knows no geographic bounds, Ponzi escaped Italy to South American just before new charges could be brought against him. Ponzi died penniless in South America. For a fascinating account of Charles Ponzi's scheme see J. NASH, BLOODLETTERS AND BADMEN, 448–451 (1973).

Once an European investor decided to purchase an interest in the American oil wells, a contract was signed in Europe by the investor and a confederate of Cook. The contract would be returned to Dallas and the agreement was recorded in the United States.

As in a classic Ponzi scheme, payments based on the false production figures were actually made to some initial investors. These payments, which were financed from capital generated by subsequent investors, also served to attract new investors. Cook and his confederates also developed investor interest by having potential investors travel to the United States and inspect various Texas oil wells.

In December 1976, the Ponzi scheme fell through and Cook's guilty plea and this appeal followed.

## II.

On this appeal, Cook contends that the district court lacked jurisdiction over the subject matter under the securities acts because the victims of his fraud were foreign investors and Congress did not intend to protect foreign investors.

This court is aware of the legal developments involving international fraud and the puzzling questions posed by some transactions with only a marginal United States nexus. *See Des Brisay v. The Goldfield Corp.*, 549 F.2d 133 (9 Cir. 1977); *Securities and Exchange Commission v. Kasser*, 548 F.2d 109 (3 Cir. 1977), *cert. denied sub nom. Churchill Forest Industries (Manitoba) Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Straub v. Vaisman & Co.*, 540 F.2d 591 (3 Cir. 1976); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2 Cir. 1975), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT v. Vencapp, Ltd.*, 519 F.2d 1001 (2 Cir. 1975); *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515 (8 Cir. 1973); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2 Cir. 1972); *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2 Cir.), *rev'd on rehearing on other grounds*, 405 F.2d 215 (2 Cir. 1968, en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Recaman v. Barish*, 408 F.Supp. 1189 (E.D.Pa.1975); *F.O.F. Proprietory Funds Ltd. v. Arthur Young & Co.*, 400 F.Supp. 1219 (S.D.N.Y.1975); *Garner v. Pearson*, 374 F.Supp. 591 (M.D.Fla.1974); *Selas of America (Nederland) N. V. v. Selas Corp. of America*, 365 F.Supp. 1382 (E.D.Pa. 1973); *United States v. Clark*, 359 F.Supp. 131 (S.D.N.Y.1973); *Finch v. Marathon Securities Corp.*, 316 F.Supp. 1345 (S.D.N.Y. 1970); *Kook v. Crang*, 182 F.Supp. 388 (S.D.N.Y.1960); *Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 F.R.D. 385 (S.D.N.Y.1969); Note, American Adjudication of Transnational Securities Fraud, 89 Harv.L.Rev. 553 (1976). Fortunately, we may leave for another day an attempt to formulate the outer perimeter of American jurisdiction. The present scheme is so far within the jurisdiction of the American courts as to give us little pause.

Cook operated out of Dallas, Texas, his actions there were hardly preparatory as some cases describe. *See Bersch, supra* at 992; *IIT, supra* at 1018. The investors invested in American securities—obviously Congress intended jurisdiction over American securities regardless to whom the securities are sold. The money from the scheme was repatriated. And some investors were actually defrauded, in part, in the United States.[4] Indeed, it appears to us that if there are any unimportant factors in the scheme it is the fact that the investors are European and the contracts were physically executed in Europe.

It is an absurd notion that Congress intended activity in the United States involving American securities to be exempt from the fraud provisions of the securities acts simply because the victims are not American citizens. Obviously, Cook and his confederates were capitalizing on the well-known American expertise in oil and gas production. Moreover, the European inves-

4. Our holding today is there is more than an adequate basis for jurisdiction based on conduct occurring in the United States. We leave for another day the possibility that jurisdiction could be found as a result of effects in the United States.

tors undoubtedly thought they could expect honest treatment from American entrepreneurs. That Congress would allow America to be a haven for swindlers and confidence men when the victims are European while expecting the highest level of business practice when the investors are American is "simply unimaginable". *IIT, supra* at 1016. As Judge Friendly said for the Second Circuit in *IIT, supra* at 1017:

> We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners. This country would surely look askance if one of our neighbors stood by silently and permitted misrepresented securities to be poured into the United States.[5]

AFFIRMED.

---

**5.** In *Leasco, Bersch,* and *IIT,* jurisdiction was found as a result of conduct in American territory. In *IIT,* Judge Friendly observed that "the securities laws are not to apply in every instance where something has happened in the United States." *Supra* at 1018. In this instant case, we need not be concerned with de minimus activity, the lion's share of the activity occurred in the United States and indeed actionable fraud occurred within the territorial confines of the United States—the oldest and surest basis for jurisdiction. In *Bersch* the court upheld jurisdiction as to American plaintiffs who were residents abroad if the American plaintiffs could show "acts . . . of material importance" occurred in the United States. Foreign plaintiffs had to show the occurrence of actual fraudulent acts in the United States. 519 F.2d at 993.

In *Kasser, supra* at 114, the Third Circuit said:
The federal securities laws, in our view, do grant jurisdiction in transnational securities cases where at least some activity designed to further a fraudulent scheme occurs within this country.