MCG, INC., et al., Plaintiffs–Appellants,

v.

GREAT WESTERN ENERGY CORP., et al., Defendants–Appellees.

No. 88–7004.

United States Court of Appeals, Fifth Circuit.

March 16, 1990.

Rodney Lee Dockery, President, MCG, Inc., James Russell Tucker, J. Michael Tibbals, Dallas, Tex., for plaintiffs-appellants.

Michael Keeley, Strasburger & Price, Sidney Powell, Dallas, Tex., for Great Western Energy, et al.

Vincent Walkowiak, Fulbright & Jaworski, Wm. Christopher Carmody, Dallas, Tex., for Brown, Shipley.

Before GARZA, REAVLEY and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Finding that it lacked subject matter jurisdiction the district court dismissed the claims of MCG, Inc., Pelco, Inc., Heritage, Inc., Bard, Inc., and Venture, Inc. (collectively MCG), for damages arising out of alleged securities fraud. MCG timely appealed. Concluding that the federal securities laws do not extend to persons who purchase stock available only on foreign markets in a wholly foreign transaction, we affirm.

## Background

All of the five plaintiffs-appellants are corporations owned and controlled by Rodney Dockery. The defendants-appellees are three Great Western companies incor-

porated in Texas or California, the London merchant bank Brown, Shipley & Co. (Brown), and four Great Western officers. The transaction out of which this dispute arose involved the sale on the London Stock Exchange of 5,000,000 shares of the common stock of Great Western Resources, Inc., a Texas corporation. MCG alleges that Great Western and Brown fraudulently induced them to purchase over $600,000 in Great Western stock when Brown took the stock public on the London Exchange in 1984.

As reflected in the prospectus prepared by Brown, the Great Western shares, as foreign securities, were not registered with the Securities and Exchange Commission. Accordingly, they had to be offered exclusively to investors who were neither citizens, residents, nationals, nor chartered residents of the United States. To ensure compliance with these restrictions, every purchaser of the securities was required to sign a declaration attesting to compliance therewith, and the stock certificates bore a legend informing of the restrictions.

The parties dispute how MCG came to be involved with the ownership of stock that was not to be sold to American investors. Dockery asserts that in the spring of 1984 he was contacted by Daniel Pena, president of Great Western, who told of his plans to take Great Western public on the London Exchange. Pena allegedly assured Dockery that the stock's value would rapidly increase from $2.00 to $13.00 per share. Dockery further claims that Jeremy Knight, a manager at Brown, called him and touted Great Western as the best oil stock available in London. Dockery claims that Pena and Knight sent him prospectuses, statements, and telexes, and telephoned him repeatedly. Dockery concludes that because of the solicitations and representations of Pena and Knight he decided, through his corporations, to invest over $600,000 in the Great Western offering.

Shortly before the purchase was to occur, according to Dockery, Pena and Knight informed him that as American entities his corporations were ineligible to purchase the shares and directed him to make the investment through an offshore company that would purchase and hold the shares on their behalf. Dockery contends that he followed this directive and engaged the services of Dennis Doherty, a financial consultant, who in turn engaged First Financial Services Company, a Hong Kong corporation, to organize Croftby Company, Ltd., a Hong Kong shell corporation wholly owned by Dockery's companies. As a non-American entity Croftby purchased the Great Western shares on the London market and held them for the benefit of Dockery's American corporations. So says Dockery.

Pena and Brown sketch a different scene. The relationship between Dockery and Great Western, they contend, began in 1982, before the events leading to the instant litigation. At that time Venture, one of the plaintiff companies, began investing in Great Western's gas projects. The investments, as Dockery conceded, were extensive. In 1983 Dockery met Pena and the two conferred frequently in 1983 and 1984, when Dockery was soliciting investors for several oil and gas projects of his own. Pena and Brown maintain that they never solicited Dockery. To the contrary, they maintain that Dockery learned of the London offering through his frequent business dealings with Great Western, dealings which enabled him to gather sufficient inside information to decide that a quick profit could be made by investing in the London offering.

Cognizant of the restrictions on sales to American investors, Dockery allegedly solicited Doherty to arrange the Great Western purchase through Croftby without defendants' knowledge. Brown insists that it did not sell shares to any purchaser that disclosed that it was acting on behalf of Dockery or his corporations, and that there is no record of any transactions between it and MCG. Brown emphasizes that MCG has never owned any stock in Great Western.

In due course Croftby purchased the shares in the London offering. To the distress of investors, rather than increasing in value the price of the shares fell. In

December 1986 Croftby sold its securities for $208,744.50, sustaining a loss of approximately $400,000. In July 1987 MCG filed suit alleging fraudulent misrepresentations in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Rule 10b–5, 17 C.F.R. 240.10b–5, the Securities Act of 1933, 15 U.S.C. § 77v(a) and pendent state claims of negligence, intentional misrepresentations, and common law fraud under Texas and California law.

Defendants denied the allegations and moved to dismiss the claims for lack of subject matter jurisdiction. Brown urged the additional defense of lack of *in personam* jurisdiction. The court first denied the motions to dismiss for lack of subject matter jurisdiction and set the *in personam* motion for hearing. At the hearing Dockery testified in person and Knight testified by deposition.

Dockery's testimony was impeached soundly. He had no records of the many contacts that allegedly occurred between him and Pena and Brown, offering only one telex, the recipient of which was ambiguous. Dockery's excuse was that Pena had come by his office one day and, with Dockery's permission, had taken possession of all of the records of their communications. Dockery conceded that only Croftby was shown as a purchaser of the stocks and further conceded that he could produce no records confirming the ownership by any of the plaintiff corporations of any stock in Great Western, or, for that matter, in Croftby.

At the close of the hearing Brown's attorneys again raised the issue of subject matter jurisdiction. The court took that motion under advisement and invited both sides to brief the issue. In the interim all other defendants filed motions challenging subject matter jurisdiction.

Finding that the plaintiffs had organized Croftby to facilitate their investment without the defendants' knowledge, and that the plaintiffs had never owned any Great Western stock, the district court dismissed MCG's claims for lack of subject matter jurisdiction. The court concluded that, having taken "every measure to avoid the [fed-eral] securities laws," the plaintiffs could not now seek their protections. MCG timely appealed.

*Analysis*

■■■ Federal courts, both trial and appellate, have a continuing obligation to examine the basis for their jurisdiction. The issue may be raised by parties, or by the court *sua sponte*, at any time. Fed.R. Civ.P. 12(h)(3); *Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc.*, 562 F.2d 938, 940 n. 2 (5th Cir.1977); *Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir.1980).

The determination of subject matter jurisdiction turns on the facts. MCG would have us regard them as the real purchasers of the stock, thus presenting a simple scenario of one American company buying shares in another American company, with the only foreign element being the purchase of the shares on the London exchange by a Hong Kong company. That simple scenario cannot be accepted. The reality we perceive is a purchase on the London Exchange by Croftby, a Hong Kong company, of shares in a foreign offering as to which American purchasers were disqualified.

A. Federal Jurisdiction—Foreign Transactions

■■■ The jurisdictional provisions of the federal securities laws "furnish no specific indications of when American federal courts have jurisdiction over securities law claims arising from extraterritorial transactions." *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 30 (D.C.Cir.1987). When Congress drafted the securities laws, it did not consider the issue of extraterritorial applicability, requiring that the federal courts fill the void. See *Zoelsch*, 824 F.2d at 30 (referring to the increasing complexity of the "web of international connections in the securities market"). Thus, there may be subject matter jurisdiction over securities fraud claims arising out of foreign transactions in certain settings.

Led by the Second Circuit, the federal courts have applied the anti-fraud provisions of the securities laws to international

transactions.[1] The first predicate for extending jurisdiction involves conduct occurring outside the United States that has an effect on the American securities markets or American investors. *See Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.1968), *modified*, 405 F.2d 215 (2d Cir.1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Sec. 416(2), *Restatement (Third) of Foreign Relations Law of the United States* (1986). The second avenue developed by the courts, however, extends federal jurisdiction to allegations of acts or omissions within the United States whose impact is felt outside our boundaries. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir.1972); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir.1975); *SEC v. Kasser*, 548 F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries, Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir.1983); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409 (8th Cir.1979); Sec. 416(1), *Restatement (Third) of Foreign Relations Law of the United States* (1987).

Because Great Western was not registered on any American exchange, and because no American individual or corporate entity can be said to have invested in the London offering, the *Schoenbaum* "effects" test is not applicable. Under such circumstances, courts have focused on three policy considerations in gauging whether to accord the anti-fraud provisions extraterritorial application. The first is the desire to avoid creating a haven within the United States for persons who would defraud foreign investors. *See Kasser*, 548 F.2d at 116; *Continental Grain*, 592 F.2d at 421–22. The second involves international reciprocity, with courts giving to innocent foreign investors lured into allegedly fraudulent schemes by acts occurring in this country, at least in part, the benefit of our securities laws, with the expectation that their governments would reciprocate. *See Vencap*, 519 F.2d at 1017, *Kasser, id.; Continental Grain, id.* Finally, courts have emphasized that exercising jurisdiction may support Congress's intent, as expressed in the anti-fraud provisions of the securities laws, to "elevate the standard of conduct in securities transactions." *Continental Grain*, 592 F.2d at 421.

As with the effects test, the Second Circuit has taken the point in developing the jurisprudence of subject matter jurisdiction over the fraud claims of foreign investors arising out of foreign transactions.[2] Emphasizing the foregoing policy considerations, our colleagues in the Second Circuit have exercised jurisdiction in cases in which foreign investors alleged fraudulent

---

1. This circuit has addressed the question of subject matter jurisdiction over securities transactions with foreign elements in only one case, *United States v. Cook*, 573 F.2d 281 (5th Cir.) *cert. den.*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). *Cook* involved an American selling shares in oil and gas wells located in the United States to European investors. Noting that the bulk of the fraudulent activity had occurred in the United States' we concluded that Cook's scheme was "so far within the jurisdiction of the American courts as to give us little pause." *Cook*, 573 F.2d at 283. Because the facts of the instant case are more tenuous than those in *Cook*, and because *Cook* expressly declined to "formulate the outer perimeter of American jurisdiction," *id.*, that case provides little guidance herein.

2. This "conduct" test was first put forth in *Leasco* wherein an American company claimed that it had been fraudulently induced by British sellers to purchase stock in a British company listed only on the London Exchange. The shares were purchased in England by a foreign subsidiary of the American company. Finding allegations of "abundant misrepresentations [by the foreign defendants] in the United States" that had induced the purchase abroad, the court stated that "[c]onduct within the territory alone would seem sufficient from the standpoint of *jurisdiction* to prescribe a rule." *Leasco*, 468 F.2d at 1334–35 (emphasis in original). While *locus delicti* was not outcome determinative, the court concluded that "we think it tips the scales in favor of applicability [of the federal securities laws] when substantial misrepresentations were made in the United States." *Leasco*, 468 F.2d at 1337.

acts in the United States, *IIT v. Vencap*,[3] but declined jurisdiction when the acts occurring in the United States were merely preparatory to the alleged fraud. *Bersch v. Drexel Firestone, Inc.*[4] This approach has been viewed as requiring that the domestic conduct needed to trigger subject matter jurisdiction must satisfy the elements of a violation of Rule 10b–5. *See Continental Grain*, 592 F.2d at 418. The Third, Eighth, and Ninth Circuits have adopted a more relaxed standard, requiring that conduct, not necessarily fraudulent itself, be alleged to have occurred in the United States in furtherance of a fraudulent scheme. *Continental Grain*, 592 F.2d at 421; *Grunenthal*, 712 F.2d at 425; *Kasser*, 548 F.2d at 114.

B. Subject Matter Jurisdiction—Case at Bar

█ Thus the cases in which jurisdiction was exercised to protect innocent foreign investors have underscored the alleged conduct of the defendants in the United States. *See Vencap* (defendants drafted investment agreement in the United States); *Continental Grain* (defendants solicited sale in Australia from within United States); *Kasser* (investment contract executed and records kept in United States crucial to consummation of the fraud); *Grunenthal* (fraudulent securities contract signed in United States). Nonetheless, "the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction in transnational securities cases is not necessarily dispositive ... A finding of jurisdiction will depend upon the analysis of the particular facts in any given case." *Continental Grain*, 592 F.2d at 414 (citation omitted).

In the case at bar the focus is not on the conduct of the defendants but on the conduct of the American plaintiffs. Our analysis begins and ends with the district court's finding that MCG sought, through extensive machinations, to avoid the application of the federal securities laws and their attendant obligations in order to facilitate their investment in a foreign offering from which they were disqualified, doing so without the knowledge of the defendants. This finding of fact, which we uphold under the clearly erroneous standard, Fed.R.Civ.P. 52(a), distinguishes MCG's case from all prior cases that have addressed the jurisdictional issue in the international context. We find this fact to be critical.

The policy concerns that have resulted in the extension of subject matter jurisdiction are not implicated where, as here, the "foreign" purchaser seeking protection is a mere "shell" created to avoid the obligations of the securities laws. Having gone to such lengths to structure[5] a transaction not burdened by the securities laws, plaintiffs cannot expect to wrap themselves in their protective mantle when the deal sours. *Cf. Royal Air Properties, Inc. v.*

3. *Vencap* involved an international investment trust organized under the laws of Luxembourg, .2% of the fundholders of which (300 persons) were American investors. Pursuant to an agreement drafted in New York and signed in the Bahamas, IIT invested in a Bahamian corporation organized by an American national residing in the Bahamas. IIT subsequently filed suit under the federal securities laws. The court held that subject matter jurisdiction existed to the extent actual fraudulent acts were alleged to have been committed in the United States that defrauded foreign investors.

4. In *Bersch*, the offered shares were described in foreign-produced prospectuses directed only to non-Americans, were not offered to Americans, were not listed on any American exchange, and accordingly were not registered under the United States securities laws. *Bersch*, 519 F.2d at 980–81. The activities within the United States included meetings between the issuing corporation and American underwriters to plan the foreign offering, meetings with the SEC, drafting of parts of the prospectus, and the opening of accounts in the Bank of New York for proceeds from the underwriting. All were "merely preparatory" to the offering. The final prospectuses, which contained the alleged misrepresentations, the court emphasized, emanated from London, Brussels, Toronto, the Bahamas, and Geneva.

5. We do not suggest that the plaintiffs engaged in any illegality. As sophisticated businessmen they have the acumen to structure transactions to their financial advantage. There is a clear distinction between structuring a transaction that "avoids" the law, as plaintiffs have done, and creating a transaction that "evades" it. One is permitted; the other is condemned.

*Smith,* 312 F.2d 210, 213–14 (9th Cir.1962) ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."). We do not view this as the type of transaction towards which "Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted...." *Bersch,* 519 F.2d at 985.

MCG's protestations to the contrary notwithstanding, this is not a case in which the issues relevant to jurisdiction and those relevant to the merits are so intertwined as to prohibit deciding one without deciding the other.[6] MCG's claims on the merits involve proof as to the defendants' conduct in inducing MCG to conclude that Great Western would be a good investment. The subject matter jurisdiction inquiry involves a discrete set of facts revolving around the actions of the plaintiffs in structuring the transaction. We need no trial on the merits in order to resolve the subject matter jurisdiction question. *McLain v. Real Estate Bd. of New Orleans, Inc.,* 583 F.2d 1315 (5th Cir.1978), *vacated on other grounds,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

Nor is an additional hearing required. In determining whether it has subject matter jurisdiction the district court may base its decision on: 1) the complaint alone; 2) the complaint supplemented by undisputed facts; or 3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts. *Williamson,* 645 F.2d at 413. MCG complains that the evidence the district court used in

deciding subject matter jurisdiction was developed in a hearing on the related issue of *in personam* jurisdiction over Brown. At this hearing, however, Dockery, who controlled the actions of the plaintiff companies, testified and was cross-examined regarding the sequence of events that led to Croftby's investment in Great Western. The hearing was followed by briefing by the parties on the issue of subject matter jurisdiction. The facts relevant to the district court's decision as to subject matter jurisdiction were included in the facts explored in the hearing on *in personam* jurisdiction. It cannot be said that MCG has been denied "an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." *Williamson,* 645 F.2d at 414.

The district court's dismissal for lack of subject matter jurisdiction is AFFIRMED.

---

6. MCG argues under *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that its claim may not be dismissed for lack of subject matter jurisdiction unless it "has no plausible foundation" or "is clearly foreclosed by a prior Supreme Court decision." *Bell v. Health–Mor, Inc.,* 549 F.2d 342 (5th Cir.1977) (articulating the standard under *Hood* ). This emphasis on *Bell v. Hood* is misplaced, for that case involved the legal sufficiency of a claim. The jurisdictional

question in the instant case, by contrast, is factual in nature. As we noted in *Williamson v. Tucker,* the standard for jurisdictional dismissals under these circumstances is arguably different. In *McLain v. Real Estate Bd. of New Orleans, Inc.,* we held that if factual issues relevant to jurisdiction and those relevant to the merits can be analyzed discretely, a court may dismiss on jurisdictional grounds.