**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-50554.

Alan ROBINSON, Plaintiff-Appellant,

v.

TCI/US WEST COMMUNICATIONS INC., TeleWest Communications PLC, U.S. West Inc., Telecommunications, Inc., Stephen Davidson, Gary Bryson, Kleinwort Benson Limited, and Kleinwort Benson of North America, Defendants-Appellees.

July 28, 1997.

Appeal from the United States District Court for the Western District of Texas.

Before SMITH, BARKSDALE and BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Alan Robinson appeals the dismissal of his complaint for lack of subject matter jurisdiction and, in the alternative, *forum non conveniens* ("f.n.c."). We reverse in part, vacate in part, and remand.

I.

In 1983, Robinson, an English citizen and resident, helped found Croydon Cable Television Limited ("CCTV"), one of the first cable franchises in England. Robinson owned only a minority interest in the company; most of CCTV's funding came from Cablevision UK Limited ("CUK"), a Florida limited partnership.

CCTV and CUK formed a partnership known as the Croydon Cable Joint Venture ("CCJV"). In 1989 CUK was sold to United Artists Cable ("UAC"), an American corporation. CUK's new owner

1

re-registered it as a Colorado partnership and renamed it the United Artists Partnership ("UAP"). CCJV was dissolved and reformed, with UAP taking the former CUK's place in the partnership.

Robinson also owned a majority interest in the predecessor to United Artists Communications (London South) PLC ("United Artists"), the English holding company for the cable franchise licenses that CCTV and the CCJV needed to do business. Prior to the key events in this case, he sold this interest to TCI/US West Cable Communications, Inc., ("TCI/US West"), a Colorado corporation. He retained, however, a separate 3.85% interest in United Artists that, through United Artists'S 25% participation in CCTV, effectively gave him his minority interest in the latter entity.

Soon after the sale of CUK to UAC, disagreements ensued between Robinson and Jim Dovey, the UAC executive in charge of the company's English cable interests. Dovey tried to persuade Robinson to trade his interest in CCTV for a non-voting interest; Robinson refused. In late 1989, Robinson brought suit in England against United Artists and three other English defendants, all of whom Robinson alleges were either directly or indirectly controlled by Tele Communications, Inc. ("TCI"), and U.S. West, Inc. ("U.S. West"), two American corporations.

The parties to the lawsuit began settlement negotiations that Robinson alleges were directed from Denver, Colorado, by TCI and U.S. West. During the negotiations, TCI and U.S. West formed

2

TeleWest Communications PLC ("TeleWest"), an English corporation consisting of a number of English cable franchises in which the two companies had majority interests.

By the fall of 1993, the state of affairs was this:  Robinson owned a 3.85% interest in United Artists.  United Artists was a 25% participant in CCTV, which by this time had changed its name to the London South Joint Venture ("LSJV").  The majority of United Artists's stock was held by TCI, U.S. West, or companies controlled by the two (such as TCI/US West, which Robinson alleges was "the mere shell company or "designee' of United Artists").  Robinson was a thorn in the side of TCI and U.S. West, or at least of the entities they controlled.  They wanted him out and were in the process of negotiating what it would cost.

Robinson alleges that in April 1993, he spoke on the phone with Gary Bryson, a U.S. West executive in Denver.  Bryson told Robinson that U.S. West wanted to settle the English lawsuit and that, to that end, Robinson should negotiate with his subordinate, Stephen Davidson, TeleWest's new finance director.  Robinson alleges that his negotiations with Davidson proceeded with the understanding that Davidson was acting on Bryson's authority.  He claims, for example, that Davidson frequently indicated that he needed approval on certain matters from Denver.  Robinson also claims that in September 1993, Davidson phoned him from Denver and requested that documents be faxed to him at that location.

After lengthy negotiations, Robinson and Davidson reached a settlement.  According to Robinson, the agreement was that he would

3

sell TCI/US West his United Artists shares in exchange for two payments, one to occur at the time the shares were signed over and one to occur later. The immediate payment was to give Robinson £790,360 in cash. The second payment was to occur within thirty days of the first of three triggering events: (1) the listing of United Artists (or any direct or indirect holding company) on the International Stock Exchange in London or any other stock exchange; (2) the sale of a controlling interest in United Artists; or (3) the passage of December 31, 1999. Robinson maintains that the interest he retained in this second payment was a security within the meaning of U.S. securities laws.

If the triggering event turned out to be the first of these, a merchant bank would be required to do a valuation of the LSJV, and Robinson would be paid according to a specified formula based on the valuation. Robinson alleges that his primary concern during the negotiations was that he be paid the full value of his interest. To that end, he says, he liked this scheme, because Davidson told him the valuation used for computing his payment would be the same one used in preparation for the stock offering. Thus, because it would be in TCI/US West's (and, therefore, in TCI and U.S. West's) interest to get a high valuation, he would be protected from an artificially low estimate.

Robinson got his £790,360 as promised. In November 1994, TeleWest purchased the assets of TCI/US West, including United Artists and the LSJV. The next day, TeleWest stock was offered for sale on both the London Stock Exchange and the NASDAQ. The stock

4

was marketed throughout the United States.

In preparation for its initial public offering, TeleWest requested a valuation from Kleinwort Benson ("KB"), an English merchant bank, and Kleinwort Benson of North America ("KBNA"), its American counterpart. For purposes of its representations to the public, KB valued the company at $540,000,000. Robinson alleges that under the formula in the settlement agreement, this valuation would have made his retained interest worth $9,000,000.

Unfortunately for Robinson, however, TeleWest instructed KB to prepare a second and separate valuation for purposes of determining the value of his stock under the settlement agreement. According to Robinson, the letter instructing KB to prepare this second valuation was drafted by, and faxed from, U.S. West's legal department. From there, he claims, it went to TeleWest, which in turn sent the letter to KB on TCI/US West's letterhead. KB conducted the second valuation, which when plugged into the formula resulted in a value of zero for Robinson's stock.

In December 1995, Robinson filed suit in federal court, alleging two rule 10b-5 causes of action,[1] RICO claims, and various state law claims. His first rule 10b-5 claim is that the defendants made an untrue statement of a material fact in connection with Robinson's sale of his stock to them, in violation of rule 10b-5(2); the second is that the defendants employed a device, scheme, or artifice to defraud him in connection with the sale of his securities, in violation of rule 10b-5(1).

---

[1] *See* 17 C.F.R. § 240.10b-5.

The defendants filed motions to dismiss based on lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and f.n.c. Robinson requested leave to conduct discovery on the jurisdictional issues, which the district court denied. On June 12, 1996, the court dismissed the case for lack of subject matter jurisdiction and, in the alternative, for f.n.c.

## II.

Robinson contends that the dismissal for lack of subject matter jurisdiction was erroneous for four independent reasons: (1) The district court ignored Robinson's allegations that TeleWest and the other English defendants were controlled by American entities such as TCI, U.S. West, and Bryson; (2) the letter instructing KB to perform a second valuation of the LSJV was written by, and sent from, the legal department of U.S. West, an American corporation; (3) the defendants' scheme utilized the NASDAQ, an American stock exchange, to defraud him; and (4) the district court reached its conclusion on subject matter jurisdiction without allowing Robinson discovery, notwithstanding the fact that it resolved factual disputes raised by the parties' conflicting affidavits. As we find the second of these arguments dispositive, we need not consider the others.

## A.

In general, we review a dismissal for lack of subject matter jurisdiction *de novo,* using the same standard as applied by the

district court.[2]  Dismissal is proper only when "it appears certain that the plaintiffs cannot prove any set of facts in support of their claim which would entitle them to relief."[3]  A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone;  (2) the complaint supplemented by undisputed facts;  or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.[4]  Where, as here, the district court has relied on the third of these bases and has made jurisdictional findings of fact, those findings are reviewed for clear error.  *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981).

### B.

Robinson's allegations require us to confront the rather nebulous issue of the extent to which the American securities laws may be applied extraterritorially.  The Securities Exchange Act of 1934—the legislation on which Robinson's rule 10b-5 claims are based—is expressly intended

> to require appropriate reports, to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose

---

[2]*McAllister v. Federal Deposit Ins. Corp.*, 87 F.3d 762, 765 (5th Cir.1996);  *Whatley v. Resolution Trust Corp.,* 32 F.3d 905, 907 (5th Cir.1994).

[3]*Saraw Partnership v. United States*, 67 F.3d 567, 569 (5th Cir.1995) (internal quotations omitted) (quoting *Hobbs v. Hawkins,* 968 F.2d 471, 475 (5th Cir.1992)).

[4]*Ynclan v. Department of the Air Force*, 943 F.2d 1388, 1390 (5th Cir.1991);  *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 176 (5th Cir.1990).

> requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b.  Section 10(b) of the Exchange Act, under which rule 10b-5 was promulgated, forbids "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails" from using "any manipulative or deceptive device" prohibited by the SEC "in connection with the purchase or sale of any security."  15 U.S.C. § 78j.  "Interstate commerce" is defined as "trade, commerce, transportation, or communication among the several States, or between any foreign country and any State, or between any State and any place or ship outside thereof."  15 U.S.C. § 78c(a)(17).  The act vests exclusive jurisdiction to adjudicate suits brought under § 10(b) in the federal district courts.  15 U.S.C. § 78aa.

As many previous courts have noted, however, with one small exception the Exchange Act does nothing to address the circumstances under which American courts have subject matter jurisdiction to hear suits involving foreign transactions.[5]  That exception, a provision governing those who conduct an extraterritorial "business in securities," *see* 15 U.S.C. § 78dd(b), does not apply in this case, as none of the parties is alleged to

---

[5]*See, e.g., MCG,* 896 F.2d at 173;  *Itoba Ltd. v. LEP Group PLC,* 54 F.3d 118, 121 (2d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 703, --- L.Ed.2d ---- (1996);  *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 29-30 (D.C.Cir.1987);  *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 993 (2d Cir.1975).

have conducted a "business in securities" anywhere.[6]

This court is thus faced with the task, as we previously have termed it, of "fill[ing] the void" created by a combination of congressional silence and the growth of international commerce since the Exchange Act was passed in 1934. *MCG,* 896 F.2d at 173. The courts that have previously addressed this problem have created two basic tests for subject matter jurisdiction:  the "conduct" test, which in essence asks whether the fraudulent conduct that forms the alleged violation occurred in the United States, and the "effects" test, which asks whether conduct outside the United States has had a substantial adverse effect on American investors or securities markets.[7]  Either may independently establish jurisdiction.  As Robinson does not argue that jurisdiction is predicated on adverse effects, however, we need concern ourselves only with the conduct test.[8]

The circuits are divided as to precisely what sort of activities are needed to satisfy the conduct test, although all agree that it is based on the idea that Congress did not want "the United States to be used as a base for manufacturing fraudulent

_____

[6]*Cf. Schoenbaum v. Firstbrook,* 405 F.2d 200, 207-08 (2d Cir.1968), *overruled on other grounds,* 405 F.2d 215 (2d Cir.1968) (en banc).

[7]*See, e.g., Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1334-37 (2d Cir.1972) (discussing conduct test); *Schoenbaum,* 405 F.2d at 206-08 (discussing effects test).

[8]*See Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 809 n. 6, 106 S.Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced.").

security devices for export, even when these are peddled only to foreigners." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975). The more restrictive position—that the domestic conduct must have been "of material importance" to or have "directly caused" the fraud complained of—is followed in the Second and District of Columbia Circuits.[9]

The discussion in *Psimenos* is perhaps the most complete statement of the test. Where (as here) the alleged fraud is in connection with a sale of securities to a foreigner outside the United States, the federal securities laws apply only if acts or culpable failures to act within the United States directly caused the plaintiff's loss. *Psimenos*, 722 F.2d at 1045 (quoting *Bersch*, 519 F.2d at 993). Thus, "foreign plaintiffs' suits under anti-fraud provisions of the securities laws [will] be heard only when substantial acts in furtherance of the fraud were committed within the United States"; activities that are "merely preparatory" will not support jurisdiction in and of themselves. *Id*. at 1045-46 (citing *Vencap*, 519 F.2d at 1018). The District of Columbia Circuit has expressly adopted the Second Circuit's caselaw in this regard. See *Zoelsch*, 824 F.2d at 33.[10]

---

[9] *See Itoba*, 54 F.3d at 122; *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045-46 (2d Cir.1983); *IIT v. Cornfeld,* 619 F.2d 909, 918-21 (2d Cir.1980); *Bersch,* 519 F.2d at 993; *Leasco,* 468 F.2d at 1335-37; *Zoelsch,* 824 F.2d at 31-33.

[10] Some courts, including the District of Columbia Circuit in *Zoelsch,* have suggested that the Second Circuit's test requires all elements of the alleged fraud to have occurred domestically. *See Zoelsch,* 824 F.2d at 31 ("The Second Circuit's rule seems to be that jurisdiction will lie in American courts where the domestic conduct comprises all the elements ... necessary to establish a

10

The Third, Eighth, and Ninth Circuits, in contrast, generally require some lesser quantum of conduct.[11]  To the extent that these cases represent a common position, it appears to be that the domestic conduct need be only significant to the fraud rather than a direct cause of it.[12]

The remaining circuits, including ours, do not appear to have taken sides in this debate.[13]  Only two Fifth Circuit cases have ever addressed the subject.  In *United States v. Cook*, 573 F.2d 281

---

violation of section 10(b) and Rule 10b-5...."); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 418 (8th Cir.1979) (same).  As we intimated in *MCG,* 896 F.2d at 174-75, this is a bit of an overstatement:  A close examination of the Second Circuit's caselaw reveals that the real test is simply whether material domestic conduct directly caused the complained-of loss.  *See, e.g., Psimenos,* 722 F.2d at 1046; *Cornfeld,* 619 F.2d at 920-21.  Because the *Zoelsch* court correctly stated this standard, *Zoelsch,* 824 F.2d at 30-31, we assume that its speculation as to what the rule "seems to be" is a simple misreading of the cases that was not intended to work any sort of implicit change in the substantive law.  In any case, the *Zoelsch* court explicitly adopted the Second Circuit's test for jurisdiction, *id.* at 33, and thus cannot reasonably be read to have fashioned a new rule.

[11]*SEC v. Kasser*, 548 F.2d 109, 114 (3d Cir.1977); *Continental Grain,* 592 F.2d at 420-21; *Travis v. Anthes Imperial, Ltd.,* 473 F.2d 515, 524 (8th Cir.1973); *Butte Mining PLC v. Smith,* 76 F.3d 287, 290-91 (9th Cir.1996); *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424-25 (9th Cir.1983).

[12]*See Kasser*, 548 F.2d at 114 (holding that the test is whether "at least some activity designed to further a fraudulent scheme occurs within this country"); *Continental Grain,* 592 F.2d at 421 (holding that jurisdiction lies where defendants used instrumentalities of interstate commerce and their "conduct in the United States was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment"); *Grunenthal,* 712 F.2d at 425 (expressly adopting the *Continental Grain* test).

[13]The Seventh Circuit has applied the conduct test to suits brought under the Commodity Exchange Act without distinguishing between the competing positions.  *See Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1107-08 (7th Cir.1984).

11

(5th Cir.1978), we rejected a jurisdictional challenge to a conviction stemming from a Ponzi scheme that victimized foreign investors but involved American securities and a considerable degree of domestic conduct. Finding the scheme "so far within the jurisdiction of the American courts as to give us little pause," we deferred for another day the "puzzling questions posed by [ ] transactions with only a marginal United States nexus." *Id*. at 283. Similarly, in *MCG*, 896 F.2d at 174-75, we merely noted the existence of the circuit split.

We adopt the Second Circuit's test as the better reasoned of the competing positions. Federal courts are courts of limited jurisdiction, and we therefore view the debate among the circuits against the background that legislation, "unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). This is not to suggest that legislation may never be applied to foreign conduct if it does not explicitly evidence such intent; as every court that has considered the issue before us has acknowledged, under some circumstances it can and should be so applied.[14] Rather, we mean only to note that the presumption against extraterritorial application informs our choice between the Second Circuit's restrictive test and the more expansive standard applied by the Third, Eighth, and Ninth Circuits.

_____

[14]*See, e.g., Leasco*, 468 F.2d at 1334; *Schoenbaum,* 405 F.2d at 206; *see also Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1107 n. 11 (7th Cir.1984).

What little guidance we can glean from the securities statutes indicates that they are designed to protect American investors and markets, as opposed to the victims of any fraud that somehow touches the United States.  *See* 15 U.S.C. § 78b; *Zoelsch*, 824 F.2d at 31-32.  To broaden our jurisdiction beyond the minimum necessary to achieve these goals seems unwarranted in the absence of an express legislative command.  *See Zoelsch,* 824 F.2d at 32.

Moreover, as the *Zoelsch* court pointed out, *id*. at 32-33, the results in *Kasser* and *Continental Grain* are based more on policy considerations than on the language of the securities statutes or the Supreme Court's teachings on extraterritoriality.[15]  We agree with the *Zoelsch* court's view that *Kasser* and *Continental Grain's* policy arguments for expanding federal jurisdiction "may provide very good reasons why Congress should amend the statute but are less adequate as reasons why courts should do so."  *Zoelsch*, 824 F.2d at 33.

## C.

With the Second Circuit's test in mind, then, we return to Robinson's contention that the instruction letter sent from U.S. West's legal department to KB via TeleWest was sufficiently significant conduct to support subject matter jurisdiction. Although the district court acknowledged that the instruction

---

[15]*See Kasser*, 548 F.2d at 116 ("From a policy perspective, and it should be recognized that this case in a large measure calls for a policy decision, we believe that there are sound rationales for asserting jurisdiction.") (footnote omitted); *Continental Grain,* 592 F.2d at 421 ("We frankly admit that the finding of subject matter jurisdiction in the present case is largely a policy decision.").

13

letter caused the valuation of which Robinson complains, it concluded that "this lone mailing, an event occurring months after the allegedly fraudulent inducement, cannot justify the heaving of an entire cause of action, all else of which involves material conduct occurring in England, across the Atlantic Ocean."

We disagree. As a threshold matter, it is not the case that all the other conduct material to the case occurred in England, although certainly most of it did. Robinson's allegation—which at this stage of the proceedings we must take as true—is that the entire scheme was directed and controlled from the United States by TCI and U.S. West. More importantly, the "lone mailing" of the instruction letter from the United States was one of the key events—if not the key event—in the alleged scheme to defraud.

The heart of Robinson's claim is that the defendants duped him into selling his stock by telling him there would be only one valuation. Regardless of whether it constitutes the totality of the alleged fraud, it is self-evident that the act of requesting the second valuation was a substantial act in furtherance of the scheme. The instruction letter was more than merely preparatory—it directly triggered the injury of which Robinson now complains. This is a sufficient basis for subject matter jurisdiction, and we accordingly reverse the dismissal of the case on this ground.

## III.

Robinson also contends that the district court erred in finding that, in the alternative, his suit should be dismissed for f.n.c. He has three arguments in this regard: (1) that there is no

14

evidence that an English forum is available; (2) that the district court improperly conducted the public and private interest tests for f.n.c.; and (3) that the district court failed to include a return jurisdiction clause in its judgment of dismissal. The burden of showing f.n.c. rests with the defendants, and we review a district court's determination for abuse of discretion.[16]

We address Robinson's third contention first. Relying on *Air Crash and Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540 (5th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 449 (1991), *appeal after remand*, 74 F.3d 567 (5th Cir.1996), *vacated and district court judgment aff'd. by an evenly divided court*, 101 F.3d 367 (5th Cir.1996) (en banc), *cert. denied*, --- U.S. ----, 117 S.Ct. 1432, 137 L.Ed.2d 540, and *cert. denied*, --- U.S. ----, 117 S.Ct. 1460, 137 L.Ed.2d 564 (1997), Robinson argues that the failure to include a return jurisdiction clause in an f.n.c. dismissal constitutes a *per se* abuse of discretion. He is correct. As the en banc court stated in *Air Crash*,

> If the district court decides that the [public and private interest factors] favor trial in a foreign forum, it must finally ensure that a plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice and that if the defendant obstructs such reinstatement in the alternative forum that the plaintiff may return to the American forum.

*Air Crash*, 821 F.2d at 1166; *see also Baris*, 932 F.2d at 1551-52.

The return jurisdiction clause is part of a larger set of

---

[16]*In re Air Crash Disaster Near New Orleans, Louisiana,* 821 F.2d 1147, 1166 (5th Cir.1987) (en banc), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989), *opinion reinstated on other grounds,* 883 F.2d 17 (5th Cir.1989) (en banc).

measures needed "to ensure that defendants will not attempt to evade the jurisdiction of the foreign courts," which may also include "agreements between the parties to litigate in another forum, to submit to service of process in that jurisdiction, to waive the assertion of any limitations defenses, to agree to discovery, and to agree to the enforceability of the foreign judgment." *Baris*, 932 F.2d at 1551. Although neither *Air Crash* nor *Baris* provides step-by-step guidance as to what combination of these measures must be implemented, *Baris* unmistakably indicates that the failure to include a return jurisdiction clause is a fatal error. *Id*. At a minimum, then, the district court's ruling on f.n.c. must be vacated and remanded for the implementation of a return jurisdiction clause.

We address Robinson's remaining contentions in the interest of judicial economy. Drawing on our cases that require the foreign forum to be both available and adequate, *e.g.*, *id*. at 1549, his first argument is that the defendants have failed to make the requisite showing that England is an available forum. That is, he argues, there is no evidence to indicate that an English forum is available, as the defendants failed to present evidence that the case and the parties can come within the jurisdiction of an English court. *See Air Crash*, 821 F.2d at 1165. In conjunction with this, he asserts that the fact that TCI and U.S. West have attempted to escape personal jurisdiction in Texas by arguing that they do not do business here indicates that they will likely make similar arguments in England.

The defendants, however, point to the uncontroverted affidavit of Michael John Brindle, Q.C., an English barrister, regarding the English courts' jurisdiction over the parties and claims in this case. According to Mr. Brindle, when one party to a fraudulent conspiracy is English, any alleged co-conspirators outside the court's ordinary jurisdiction may be joined as "necessary or proper parties" under Order 11 of the Rules of the Supreme Court of England and Wales. We do not think the district court abused its discretion in relying upon this testimony to find that an English forum is available. As we stated in *Baris*, 932 F.2d at 1551, it is within the court's discretion to determine what measures it must implement so as "to ensure that defendants will not attempt to evade the jurisdiction of the foreign courts." So long as this general requirement is met, we will not take issue with the manner in which the district court has chosen to comply with it.

Robinson also argues that there is insufficient evidence in the record to support the district court's findings on the private and public interest tests. With some deference to the plaintiff's choice of forum, the private interest factors that the court must consider include

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the costs of obtaining attendance of willing, witnesses; probability of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained.

*Air Crash*, 821 F.2d at 1162 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)). When the

17

private interest factors do not weigh in favor of dismissal, the court must also consider "the administrative difficulties flowing from court congestion; the local interest in having localized controversies resolved at home; ... the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id*. at 1162-63 (citing *Gulf Oil*, 330 U.S. at 508-09, 67 S.Ct. at 842-43).

Nothing in the record persuades us that the district court abused its discretion in this regard. Robinson and Davidson are English citizens who reside in England. TeleWest is an English corporation, and Kleinwort Benson an English merchant bank. With the exception of TCI, U.S. West, and the allegation that they controlled and directed English entities from the United States, everything in this case is grounded in England. Certainly nothing suggests that the cause should be tried in Texas (as opposed to Colorado, the place where TCI and U.S. West are alleged to have orchestrated the fraud).

Robinson protests that many of the potential witnesses are located in the United States and that certain types of discovery available to him here will not be available in England. Given the enormous scope of discovery permitted under American law, we have little doubt that he is correct about this. The argument, however, is in essence an attack on the quantum of the defendants' proof in the district court rather than on its substance, a basis on which we are highly reluctant to find an abuse of discretion. We

18

therefore conclude that the district court did not err in deciding that this case belongs in England, and accordingly we remand with instruction to reinstate the dismissal following the inclusion of a return jurisdiction clause.

For the foregoing reasons, we REVERSE the dismissal for lack of subject matter jurisdiction, VACATE the determination as to f.n.c., and REMAND with instruction to dismiss following the addition of a return jurisdiction clause to the judgment.