**Thor K. TJONTVEIT, Successor in Interest to Nord Construction Scandinavia A/S, Plaintiff,**

v.

**DEN NORSKE BANK ASA, a Foreign Corporation, Defendant.**

**Civil Action No. H–96–3579.**

United States District Court,
S.D. Texas.

March 2, 1998.

David Henry Martin, Waco, TX, Michael J. Reiser, Rankin Sproat Pollack Mires Trapani and Reiser, Oakland, CA, for Plaintiff.

Thor K. Tjontveit, Fort Worth, TX, pro se.

Linda L. Addison, Fulbright and Jaworski, Houston, TX, Zack A. Clement, Fulbright & Jaworski, Houston, TX, Edna Michelle Bohreer, Hirsch Sheiness and Garcia, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is defendant Den norske Bank ASA's ("DNB") motion to dismiss for *forum non conveniens,* or in the alternative to stay the action (# 45). Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that DNB's motion to dismiss should be granted and that Plaintiff Thor K. Tjontveit's ("Tjontveit") action against DNB should be dismissed on the grounds of *forum non conveniens.*

### I. *Background*

#### A. *Transactions at Issue*

Tjontveit, a citizen and resident of Texas, was the owner of several international businesses. One of the corporations involved in this dispute, Nord Construction Scandinavia A/S ("Nord"), was a Norwegian corporation. Nord was owned equally by Tjontveit individually and another of his corporations, Wien Air Alaska, Inc. ("Wien"), an Alaska corporation with its principal place of business in Texas. At the time of the events giving rise to this action, Tjontveit was the sole shareholder of Wien. Wien is now owned entirely

by TTA Holding Company ("TTA"), a Texas corporation, of which Tjontveit is the sole shareholder. Tjontveit asserts that Nord's principal place of business was Texas because it was headquartered and operated by him in Hurst, Texas. DNB maintains that Nord's principal place of business was Norway and offers evidence that Nord's registered address was in Kristiansand, Norway, its business operations were conducted in Norway, its assets (consisting primarily of heavy construction equipment) were located in Norway, its management staff resided in Norway, and it books and records were kept in Norway, where it was audited.

In 1990, Nord began negotiations with a citizen of Norway, Karstein Gjersvik ("Gjersvik"), for the purchase of certain shares of stock in a Norwegian corporation, Air Express. A final written agreement permitting Nord to purchase the stock for 9.287 million Norwegian Kroner ("NOK") (approximately $1,527,466 U.S.), was executed in Norway on or about August 15, 1990. In compliance with the stock purchase agreement, Tjontveit, on behalf of Nord, entered into an agreement in Oslo, Norway, with DNB, a Norwegian bank, for the bank to act as trustee for the transaction. Specifically, DNB was to accept for deposit the Air Express shares and, upon receipt of confirmation by a specified date of a deposit by Nord of the full purchase price in Gjersvik's account at ABC–Bank Norway ("ABC"), execute the paperwork necessary to transfer the stock certificates to Nord. The stock certificates were to be delivered to Nord's registered address in Norway. The purchase agreement called for an initial down payment equaling one-half of the total purchase price, or 4.6435 million NOK (approximately $763,733 U.S.). Nord timely deposited this sum with DNB in August 1990.

Tjontveit claims that in September 1990, despite Nord's compliance with all the terms of the stock purchase agreement, DNB failed to verify that the balance of the payment due for the shares had been transmitted to Gjersvik's account at ABC from Tjontveit's account at Deutsche Bank, a German Bank. Tjontveit asserts that, in violation of the terms of the trust, DNB refused to deliver the Air Express shares to Nord, and, instead, on September 16, 1990, transferred title to a third-party purchaser, Ecco Corporation, a Norwegian corporation, upon its payment of the balance of 4.6435 million NOK (approximately $763,733 U.S.). Consequently, Gjersvik retained the down payment. Tjontveit maintains that, as a result of DNB's actions, the down payment was forfeited, the Air Express transaction was aborted, and Nord was forced to cease operations. DNB, which had provided Tjontveit with overdraft funds for the down payment on the Air Express stock, sought collection of the debt. Nord, upon ceasing to do business, assigned its assets to Tjontveit, who brings this claim as successor-in-interest to Nord.

In January 1991, in an unrelated transaction, German Express Luftfahrt Beteiligungs ("GMBH"), a German corporation, owned equally by Nord and Tjontveit, entered into a final written agreement for the purchase of a Boeing 707 aircraft from 707 Three Leasing Ltd. ("LTL"), a Cayman Islands corporation, headquartered in the Philippines. The contract, which was executed in England and designated English law as the governing law, called for GMBH to pay $5,350,000 U.S. to LTL and to deliver title to two Beech aircraft in exchange for the Boeing 707. GMBH paid $850,000 U.S. to LTL and delivered title to the two Beech airplanes. According to Tjontveit, unknown to GMBH and himself, DNB had a lien on the 707. In fact, DNB had a debenture on all of the otherwise unpledged assets of LTL. Tjontveit contends that although DNB knew of LTL's purchase agreement with GMBH, neither the bank nor LTL notified GMBH of the existing lien.

The purchase contract called for payment of the balance owing on the Boeing 707 at a date after physical delivery of the aircraft. In February 1991, LTL delivered the 707, along with a purchase invoice, to GMBH in England. On its first take-off following delivery, an engine on the 707 failed, but the plane landed safely in Brussels, Belgium. GMBH obtained a replacement engine for $535,000 U.S. and installed it on the aircraft. While the 707 was in the possession of a lessee of GMBH, Mercury Airways, in Brussels, DNB seized the plane, claiming that

LTL had failed to perform certain of its obligations to DNB. In 1993, GMBH assigned its right to prosecute this action to Tjontveit.

Tjontveit initially brought this action *pro se* against DNB in Texas state court on August 26, 1996. After DNB removed the case to federal court on October 21, 1996, Tjontveit retained counsel and amended his complaint. In the amended complaint, Tjontveit seeks recovery for breach of contract, common law fraud, fraudulent inducement, civil conspiracy, fraudulent concealment, and breach of fiduciary duty. Tjontveit claims that in September 1990, DNB breached its fiduciary duty to Nord as a beneficiary under the trust agreement by failing to deliver the Air Express stock to Nord. Tjontveit further complains that DNB failed to disclose the lien it held on the Boeing 707 and wrongfully seized the aircraft from GMBH's lessee.

On May 9, 1997, DNB filed the instant motion to dismiss based on the doctrine of *forum non conveniens,* or alternatively, to stay, on the grounds that Norway is a more convenient forum. DNB contends that both of the claims now asserted by Tjontveit were released in a settlement agreement executed in Oslo, Norway, dated January 13, 1994. The settlement agreement contains a forum selection clause and a choice-of-law provision in which the parties agree to resolve any disputes concerning the agreement in the Oslo City Court in Oslo, Norway, under Norwegian law. DNB brought legal proceedings in Norway to foreclose liens on real estate that are also a subject of the agreement. DNB declares Tjontveit's current lawsuit to be "a transparent attempt to complicate and thus delay the previously pending foreclosure actions in Norway and to avoid the release and forum selection clause of the Norwegian agreement." DNB maintains that it will be greatly inconvenienced if it is required to try these matters twice, once in Norway in connection with the foreclosures and again in this court.

### B. *Previous Legal Proceedings*

From 1989 to 1991, Tjontveit obligated himself to DNB, through its Kristiansand Branch, for approximately 13 million NOK both by borrowing and by guaranteeing his companies' debts; the guarantees were later converted into notes from Tjontveit. According to DNB, shortly after borrowing these funds, Tjontveit defaulted on payment and has never voluntarily repaid any of the debt. In April 1993, Tjontveit instituted two legal proceedings, termed "Conciliations," against DNB in Norway. In one of these actions, Tjontveit alleged misconduct by DNB as the escrow agent in the Air Express transaction. Tjontveit asserted that, as a result of DNB's actions, he had "suffered major financial losses in connection with the operation of his businesses in Norway," seeking damages in the amount of 10.5 million NOK as well as the repayment of 7 million NOK plus interest at the rate of 18 per cent from September 1, 1990, for the loss of the shares. In the second proceeding, Tjontveit, along with GMBH and Wien, alleged that DNB had failed to disclose that it had a lien on the Boeing 707 and sought the return of $850,000 U.S., the two Beech aircraft, and the engine. Tjontveit also caused Wien to sue DNB in England concerning the purchase of the Boeing 707. When DNB demanded that Wien put up its share of attorneys' fees as required by English law, it failed to do so, and the English Court ordered Wien to pay DNB 93,958£.

In late 1993, Tjontveit negotiated a settlement agreement with DNB in which he agreed to drop the two legal proceedings he had brought in Norway in return for an agreement by DNB to reduce his debt, which totaled approximately 10.5 million NOK, and sequence foreclosure on collateral so that DNB would foreclose last on his farm in Norway. Although the parties met once in New York to discuss the proposed settlement, the settlement agreement was signed by all the parties (including Tjontveit, Wien, and DNB) in Oslo, Norway, on January 13, 1994. In a paragraph entitled, "Proper venue, choice-of-law," the agreement states, "This Agreement shall be governed solely by Norwegian law and the parties agree to Oslo City Court as the proper venue." In addition to the legal actions instituted by Tjontveit, which have been dismissed, DNB

brought suit in Norway to foreclose liens on Norwegian real estate which had been furnished as security by Tjontveit. The Norwegian courts denied Tjontveit's motion to stay the foreclosures pending the outcome of the instant litigation. The foreclosure action on Tjontveit's apartment in Kristiansand was withdrawn by DNB because the mortgage was paid and assumed by Wien.

## II. *Analysis*

The doctrine of *forum non conveniens* rests upon a court's inherent power to control the parties and cases before it and to prevent its process from becoming an instrument of abuse or injustice. *See In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1153–54 (5th Cir.1987) ("Air Crash Disaster"), *vacated on other grounds sub nom. Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989); *see also In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 383 (3d Cir.1997). Through this power, a federal trial court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, where it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 530–31, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Air Crash Disaster*, 821 F.2d at 1154. If trial in the forum initially selected by the plaintiff would be unduly burdensome to the defendant, the case may be dismissed in favor of a more convenient alternative forum. *See Reyno*, 454 U.S. at 259.

In *Gilbert*, the Supreme Court established a balancing test whereby lower courts must weigh a variety of public interest and private interest factors in analyzing a motion to transfer or dismiss under the doctrine of *forum non conveniens*. *See* 330 U.S. at 508–09. In *Air Crash Disaster*, the Fifth Circuit confirmed the criteria established in *Gilbert* and set forth a three-step inquiry:

(1) Is there an available and adequate forum;

(2) If so, do the relevant factors of private interest mandate dismissal; and

(3) If not, do the relevant factors of public interest mandate dismissal.

*See Air Crash Disaster*, 821 F.2d at 1165; *accord Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir.), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993); *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1550–51 (5th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 449 (1991). Once an available and adequate foreign forum is found to exist, if the private interest factors weigh in favor of dismissal, no further inquiry need be made. *See Baris*, 932 F.2d at 1550; *Air Crash Disaster*, 821 F.2d at 1165. Only if the court cannot determine whether such private factors weigh in favor of dismissal is it required to examine the public interest factors. *See Baris*, 932 F.2d at 1550–51; *Air Crash Disaster*, 821 F.2d at 1165. The ultimate inquiry is where the trial will best serve the convenience of the parties and the ends of justice. *See Koster*, 330 U.S. at 527. The defendant bears the burden of invoking the doctrine and persuading the court that the outcome of the *forum non conveniens* analysis favors dismissal. *See Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 907 (5th Cir.1997); *Air Crash Disaster*, 821 F.2d at 1164.

### A. *Existence of Alternative Forum*

For a *forum non conveniens* dismissal to be appropriate, an available and adequate foreign forum must exist. *See Kamel v. Hill–Rom Co., Inc.*, 108 F.3d 799, 802 (7th Cir.1997); *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th Cir.1996). A foreign forum is available when the entire case and all the parties can come within the jurisdiction of that forum. *See Robinson*, 117 F.3d at 908; *Air Crash Disaster*, 821 F.2d at 1165; *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 830 (5th Cir.1986). A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they

might receive in an American court. *See Air Crash Disaster,* 821 F.2d at 1165 (citing *Reyno,* 454 U.S. at 255); *accord Empresa Lineas Maritimas Argentinas, S.A. v. Schichau–Unterweser, A.G.,* 955 F.2d 368, 372 (5th Cir.1992); *Syndicate 420 at Lloyd's London,* 796 F.2d at 829. Absent unfair treatment, a difference in the law of the alternate forum is not a substantial factor to consider. *See Empresa,* 955 F.2d at 372 (citing *Reyno,* 454 U.S. at 254–55). "A court may dismiss on *forum non conveniens* grounds even though the foreign forum does not provide the same range of remedies as are available in the home forum. However, the alternative forum must provide some potential source for redress." *Kamel,* 108 F.3d at 803 (quoting *Ceramic Corp. of Am. v. Inka Maritime Corp., Inc.,* 1 F.3d 947, 949 (9th Cir.1993)).

### 1. *Availability of Remedy*

■ Here, it is apparent that Norway provides a suitable remedy for the types of wrongs alleged by Tjontveit. Indeed, he instituted legal proceedings in Norway based on the same transactions, seeking the recovery of substantial amounts of damages. Because DNB is a Norwegian bank, owned primarily by Norwegian governmental entities, with its principal place of business in Norway, there should be no difficulty in obtaining jurisdiction over DNB in Norway.[1] In any event, any concerns about lack of jurisdiction over DNB are eliminated by DNB's consent to jurisdiction in the courts of Norway. *See Kamel,* 108 F.3d at 803; *Magnin,* 91 F.3d at 1429; *Nolan v. Boeing Co.,* 919 F.2d 1058, 1068 (5th Cir.1990), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991); *Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 728 (5th Cir.1990), *cert. denied,* 499 U.S. 925, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991); *Veba–Chemie A.G. v. M/V Getafix,* 711 F.2d 1243, 1245 (5th Cir. 1983); *Vaz Borralho v. Keydril Co.,* 696 F.2d 379, 392 n. 12 (5th Cir.1983).

Tjontveit, however, contends that substantial deference should be accorded to his selection of this forum. A plaintiff's choice of forum is generally entitled to greater deference when the plaintiff has chosen his home forum. *See Reyno,* 454 U.S. at 255–56; *Air Crash Disaster,* 821 F.2d at 1164; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India,* 809 F.2d 195, 202–03 (2d Cir.), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987); *Jeha v. Arabian Am. Oil Co.,* 751 F.Supp. 122, 127 (S.D.Tex.1990), *aff'd,* 936 F.2d 569 (5th Cir.1991). "A citizen's forum choice should not be given dispositive weight, however." *Reyno,* 454 U.S. at 256 n. 23; *accord Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir.1996); *Automated Marine Propulsion Sys., Inc. v. Aalborg Ciserv Int'l A/S,* 859 F.Supp. 263, 267 (S.D.Tex.1994).

> Citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper.

*Reyno,* 454 U.S. at 256 n. 23. The plaintiff must make a "real showing" of convenience that will outweigh the inconvenience the defendant may have shown. *Koster,* 330 U.S. at 524; *see Aalborg,* 859 F.Supp. at 267. A plaintiff will not be deprived of the presumed advantage of his home jurisdiction except when the facts clearly show such inconvenience "to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Koster,* 330 U.S. at 531–32.

■ In this instance, Tjontveit is suing merely as the assignee and successor-in-interest to Nord and GMBH. Federal courts have long treated motion for *forum non conveniens* dismissals differently depending on whether a United States plaintiff is suing in his own right or is a nominal plaintiff, suing as an assignee, subrogee, or representative of a foreign company. *See Pain v. United Tech. Corp.,* 637 F.2d 775, 798 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71

---

**1.** Although DNB has a small office in Houston, Texas, it played no role in any of the transactions at issue in this lawsuit.

L.Ed.2d 116 (1981); *Del Monte Corp. v. Everett S.S. Corp., S/A,* 402 F.Supp. 237, 243 (N.D.Cal.1973). In the latter case, "courts have generally refused to give special deference to the domestic forum choice of a nominally American plaintiff." *Pain,* 637 F.2d at 798. In any event, "American citizens and residents have no indefeasible right of access to the federal courts." *Id.; see Ionescu v. E.F. Hutton & Co. S.A.,* 465 F.Supp. 139, 145 (S.D.N.Y.1979) ("an American citizen has no absolute right to sue in an American court").

While this court accords some deference to Tjontveit's choice of this forum, DNB's inconvenience greatly outweighs the deference due to this choice in view of the extremely tenuous relationship of the underlying dispute to the Southern District of Texas. Moreover, the parties executed a settlement agreement in Norway on January 13, 1994, purporting to settle and compromise the very claims Tjontveit is now asserting in this proceeding. The settlement agreement contains a forum selection clause and choice-of-law provision which specifies the Oslo City Court as the proper venue and designates Norwegian law as the governing law. Tjontveit acknowledges the settlement agreement in his amended complaint and, in a related action pending in this court, Wien bases its claims on the agreement, alleging that DNB breached the settlement agreement by failing to transfer and attempting foreclosures of mortgages subject to the agreement.

■ A forum selection clause is presumably valid and creates a strong presumption favoring venue in the agreed-upon forum. *See, e.g., Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 287 n. 2 (5th Cir.1989). In fact, "courts in recent years have rarely taken jurisdiction over cases in which a different forum was selected by the parties." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 421 rep. n. 6 (1988) Likewise, choice-of-law clauses are generally upheld if reasonably related to the transaction and the chosen law is not contrary to the fundamental policy of the forum.

*See Caton v. Leach Corp.,* 896 F.2d 939, 942 (5th Cir.1990). Indeed, "[t]he Supreme Court has consistently held forum-selection and choice-of-law clauses presumptively valid." *Mitsui & Co. (USA), Inc. v. Mira M/V,* 111 F.3d 33, 35 (5th Cir.1997) (citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 537–38, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995)). While it is undisputed that the settlement agreement was signed by all the parties, there appears to be a controversy, at least in this proceeding, concerning whether it ever became effective due to the parties' purported failure to comply with certain conditions precedent. In the *Wien* action, however, Wien takes the contrary position, *i.e.,* that the settlement agreement is enforceable and DNB breached its terms. Without regard to whether it ever became legally effective, however, the agreement between the parties specifying an Oslo forum and the application of Norwegian law is strong evidence of the parties' intentions and expectations regarding the governing law and proper venue for the underlying dispute. Hence, giving effect to the forum selection clause would appear to fulfill the reasonable expectations of the parties. *See Royal Bed & Spring Co., Inc. v. Famossul Industria e Comercio de Moveis Ltda.,* 906 F.2d 45, 53 (1st Cir.1990).

### 2. *Adequacy of Remedy*

■ The remedies afforded by the courts of Norway also appear to be adequate and in line with remedies available under Texas and American law. The substantive law of the foreign forum is presumed to be adequate, unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there. *See Empresa,* 955 F.2d at 372; *Vaz Borralho,* 696 F.2d at 392–93.

Tjontveit asserts, based in part on the depositions of Jan Blehr ("Blehr") and Per Lie ("Lie"), that beginning in the late 1980s, he has been portrayed negatively in the Norwegian press, and, consequently, he cannot receive a fair trial in Norway. Tjontveit's opinion, as well as that of Blehr and Lie,

however, are purely speculative, unsupported by facts, and based primarily on hearsay and double hearsay, such as an alleged conversation between Blehr and a fellow passenger on board an airplane while flying over Greenland and Alaska. Copies of the purported negative publicity were not furnished the court. Moreover, when questioned by defense counsel, Lie could not specify any item that had been published about Tjontveit that was untrue. Such bare and conclusory allegations simply do not constitute probative evidence. *See BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996); *Richardson v. Oldham,* 12 F.3d 1373, 1378 (5th Cir.1994). In addition, notwithstanding the alleged negative press, Tjontveit filed the two Conciliations against DNB in Norway in 1993, along with other legal actions he or his companies have instituted there in recent years.

Tjontveit further contends that, due to the negative publicity, he has been treated unfairly by the Norwegian courts in the past. In support of this assertion, he offers two letters submitted to the Norwegian courts by his attorneys, Bruce L. Mansfield ("Mansfield") and Tor A. Fusdahl, complaining that Tjontveit did not receive adequate notice of prior court proceedings. The letters reflect that a Norwegian court attempted at least twice, beginning in early November 1994, to have a notice of a December 13, 1994, hearing personally served on Tjontveit at his home in Texas by the United States Marshals Service. Because Patricia Long ("Long"), a corporate officer of Wien and GMBH, refused to accept service, he did not receive notice of the hearing until he returned to his residence on December 8, 1994, four days prior to the hearing. This sequence of events does not suggest manifest unfairness or prejudice against Tjontveit by the Norwegian courts. Furthermore, the letters from Tjontveit's counsel are entirely self-serving and contain rather strong language castigating the Norwegian judiciary. The letters accuse the Norwegian courts of being unfair, intentionally setting up obstacles against Tjontveit, choosing to act at variance with mandatory rules, and being predisposed against him. Mansfield's letter also requests the court to recuse itself and threat-

ens that if Tjontveit is incapable of receiving a fair trial in Norway, they will "file a complaint with the United States Justice and State Departments." While such letters would not endear him to the Norwegian judiciary, this court cannot conclude that the Norwegian courts were unfair to Tjontveit merely because he did not prevail, apparently due in part to his own lack of vigilance. Moreover, any future concerns regarding service could be addressed by Tjontveit appointing authorized representatives to accept service on his behalf in both Norway and the United States, a prudent course of action for any individual who is involved in multi-national business activities. As the Fifth Circuit observed in *Veba–Chemie,* this court will assume, unless presented with objective evidence to the contrary, "that national tribunals will treat evenhandedly resident and nonresident parties." 711 F.2d at 1250; *see Carnival Cruise Lines, Inc. v. Oy Wartsila Ab,* 159 B.R. 984, 994 (S.D.Fla.1993). Indeed, Mansfield's letter reflects that Nord availed itself of the very same Norwegian forum of which Tjontveit now complains to file suit against Ecco/Eidjord/A–Fly Holding for 4.5 million NOK in 1992. Hence, Tjontveit has not shown that he is unable to obtain basic justice in Norway.

The plaintiff may not defeat a motion to dismiss on the basis of *forum non conveniens* merely by showing that the substantive law that would be applied in an alternative forum is less favorable to him than the chosen forum. An unfavorable change in the law occasioned by adjudication in a foreign forum generally is not a relevant factor in the forum analysis. *See Reyno,* 454 U.S. at 250–51; *Empresa,* 955 F.2d at 372. Similarly, the comparative amount of recovery obtainable in the alternative forum has never been considered a factor relevant to the *forum non conveniens* inquiry. *See Pain,* 637 F.2d at 794. It is only when the change in law results in no remedy at all or in unfair treatment to the plaintiff that the alternative forum may be deemed inadequate. *See Reyno,* 454 U.S. at 254–55; *Empresa,* 955 F.2d at 372. Because Norwegian substantive law would appear to apply to the Air Express transaction and English or Norwegian law to

the Boeing 707 claim, whether tried in this forum or abroad, Tjontveit is not prejudiced by the Norwegian courts resolving this matter, as Texas and American law have no bearing on the issues in dispute. In addition, any concerns about the enforceability of a judgment obtained in Norway are allayed both by the presence of the assets of DNB in the foreign forum and the condition imposed by the court that DNB agree to pay any final judgment rendered by the foreign court. Tjontveit also may be able to enforce in Texas any judgment he obtains against DNB in Norway under the Uniform Enforcement of Foreign Judgments Act. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 36.001 *et seq.*

While Tjontveit complains about the unavailability of a jury trial in Norway, the lack of a jury trial does not render Tjontveit's remedy in Norway inadequate. *See Reyno,* 454 U.S. at 252 n. 18; *Magnin,* 91 F.3d at 1430; *Lockman Found., v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir. 1991); *Delgado v. Shell Oil Co.,* 890 F.Supp. 1324, 1357 n. 79 (S.D.Tex.1995). As the Supreme Court noted in *Reyno,* "jury trials are almost always available in the United States, while they are never provided in civil law jurisdictions .... [e]ven in the United Kingdom, most civil actions are not tried before a jury." 454 U.S. at 252 n. 18 (citations omitted). "Yet, there are numerous decisions dismissing cases in favor of a civil law jurisdiction forum, and in favor of the United Kingdom as a forum." *Magnin,* 91 F.3d at 1430. Indeed, in *Pain,* the District of Colombia Circuit found that the district court properly dismissed wrongful death actions brought by the families of helicopter crash victims on the basis of *forum non conveniens* in favor of a Norwegian forum. *See* 637 F.2d at 793.

Similarly, the imposition of a bond to secure the payment of attorneys' fees and court costs does not make Norway an inadequate forum. *See Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1353 (1st Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993); *Torres v. Southern Peru Copper Corp.,* 965 F.Supp. 899, 903–04 (S.D.Tex.1996), *aff'd,* 113 F.3d 540 (5th Cir. 1997); *Nai–Chao v. Boeing Co.,* 555 F.Supp.

9, 16 (N.D.Cal.1982), *aff'd sub nom. Cheng v. Boeing Co.,* 708 F.2d 1406 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983). As DNB points out, however, because these claims may be asserted as responses or defenses to the foreclosure proceedings brought by DNB, the bond requirement would not apply. Only if Tjontveit commences litigation against DNB apart from the foreclosure proceedings will he be required to post a bond. In addition, any extra costs incurred in filing suit in Norway will be offset, at least in part, by the substantial savings to Tjontveit of litigating the matter in Norway, eliminating the need for experts on Norwegian law, document translators, court interpreters, and the costly and time-consuming travel of witnesses to Texas. In fact, in March 1997, Tjontveit complained in papers filed with the court of the "considerable expense in making travel arrangements for Mr. Reme and Mr. Blehr."

In any event, it would be inappropriate to insist on the "parochial concept that all disputes must be resolved under our laws and in our courts" and that anything short of American justice is inadequate. *See Seguros Comercial Americas S.A. de C.V. v. American President Lines, Ltd.,* 933 F.Supp. 1301, 1309 (S.D.Tex.1996). The United States is not required "to be courthouse or law maker for the world." *Vaz Borralho,* 696 F.2d at 390. Accordingly, Tjontveit has not shown that any remedy that he might obtain in a Norwegian court would be inadequate.

### B. *Private Interests of the Litigants*

■ In *Gilbert,* the Supreme Court set forth certain considerations relating to the interests of the litigants and the public that are to be weighed in making a *forum non conveniens* determination. The private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for the attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; (3) the possibility of a view of the premises, if a view would be appropriate to the action; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *See Gilbert,* 330 U.S. at 508; *see also Reyno,*

454 U.S. at 241 n. 6; *Robinson,* 117 F.3d at 908.

### 1. *Access to Proof*

The comparative ease of access to proof strongly weighs in favor of DNB's position that this action should be tried in Norway. The Air Express stock purchase agreement and the trust agreement were both executed in Norway. The underlying events occurred in Norway when DNB, a Norwegian bank, failed to deliver stock in a Norwegian corporation to Nord in Norway, but instead transferred the stock to another Norwegian corporation. Tjontveit claims that DNB breached the trust agreement when it failed to deliver the stock to Nord despite its payment of the balance of the purchase price to Gjersvik's account at another Norwegian bank. The events surrounding the Boeing 707 purchase arose primarily in England, where the contract to purchase the aircraft was signed and the plane was housed. Tjontveit alleges that DNB failed to disclose to a German corporation that it had a lien on the Boeing 707 and wrongfully seized the aircraft from GMBH's lessee in Belgium.

To support or defend these claims, the parties will require numerous witnesses and documents from abroad. Indeed, of the thirty fact witnesses listed in Tjontveit's amended disclosures, nineteen reside in Norway, Germany, or elsewhere in Europe. Of these witnesses, eight reside in Norway, four in Germany, four in England, two in Sweden, and one in Spain. The remaining eight witnesses reside in the United States, six of whom live in Texas, including Tjontveit and Long. Of the three witnesses whose addresses are unknown, one formerly resided in London and two in Norway, one of whom was the former managing director of Nord. Only four of these witnesses are currently employed by DNB or one of its subsidiaries. Tjontveit has also designated two expert witnesses—a professor of law at the University of Oslo, who resides in Norway, and a certified public accountant, who resides in Houston. In its amended disclosures, DNB lists five additional witnesses, two of whom reside in Norway, two in the United States, and one in England. In making a *forum non conve-*

*niens* determination, the court should concentrate primarily upon the availability of key witnesses, especially third-party witnesses. *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993) (citing *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 451–52 (2d Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976)); *Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd.,* 860 F.Supp. 1055, 1066 (D.N.J.1994); *Wartsila,* 159 B.R. at 995. "[L]ive testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor." *Allstate,* 994 F.2d at 1001; *see Kultur,* 860 F.Supp. at 1067; *Wartsila,* 159 B.R. at 995; *ACLI Int'l Commodity Servs. v. Banque Populaire Suisse,* 652 F.Supp. 1289, 1296 (S.D.N.Y.1987). "[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their case on deposition, is to create a condition not satisfactory to court, jury or most litigants." *Gilbert,* 330 U.S. at 511. In this situation, aside from Tjontveit, the witnesses who reside in Norway or elsewhere in Europe are more crucial than those who reside in the United States. Thus, it would be far more convenient and less costly for them to appear at trial in Norway than in Houston, Texas.

Moreover, assuming the Norwegian and other European witnesses could be brought to Texas for trial, it is likely that language barriers would prevent an expeditious trial of this lawsuit here. *See Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978); *Seguros,* 933 F.Supp. at 1311; *Fassi v. LJN Toys, Ltd.,* 753 F.Supp. 486, 489 (S.D.N.Y. 1990), *aff'd,* 948 F.2d 1276 (2d Cir.1991). Many of the witnesses residing in Norway and other countries, including third-party witnesses, would require the services of interpreters, which is both costly and time-consuming. *See Schertenleib,* 589 F.2d at 1165. Even if a witness speaks English well enough to be understood by his fellow countrymen, a heavy accent might be extremely difficult for a Texas jury to comprehend and obtain a clear grasp of the nuances of the witness's testimony. Indeed, Tjontveit, who has resided in this country for some time,

has a pronounced accent, and his English is difficult to understand at times.

As with the witnesses, many of the documents relevant to this action are located in Norway or England. Documents concerning the Air Express stock purchase agreement, the trust agreement, and the records of ABC are no doubt in Norway, where the agreements were executed and were to be performed. Documents regarding the purchase of the Boeing 707 are in England, where the transaction was negotiated and the agreement was executed. Tjontveit claims that he has copies of the relevant agreements but not the originals. There is no evidence that any of the original agreements were created or are maintained in Texas. Although some of the witnesses and documents relating to the proof of the case may be located in the United States, this factor alone is insufficient to require that the action be litigated in Texas. *See Empresa*, 955 F.2d at 375; *Vaz Borralho*, 696 F.2d at 391. The documents written in Norwegian would have to be translated into English, an expensive and time-consuming process which could be avoided if the trial took place in Norway. *See Schertenleib*, 589 F.2d at 1165. While some of the documents have already been translated, the translations often entail unusual word choices and odd syntax, calling into question whether the translations are entirely accurate and making it difficult for a Texas jury to understand fully the documentation of these rather complex, commercial transactions. In addition, the documents, including the settlement agreement and related correspondence, contain numerous references to large sums of money expressed in Norwegian Kroner, requiring a Texas jury to convert these amounts mentally to dollars in order to be meaningful—not an easy task. Because most of the witnesses and documents are located in Europe, primarily in Norway, it would be far more convenient for these witnesses and less costly for the parties to litigate this matter in Norway, rather than in Texas.

### 2. *Attendance of Witnesses*

Due to the fact that many of the potential witnesses and documents are located in Norway, cost considerations dictate that a trial in Norway would be more expedient. Transportation of any witnesses willing to testify in Texas would be expensive and time-consuming. Beyond financial concerns, uncooperative witnesses present an even greater obstacle. This court cannot compel residents of foreign countries, or even of New York or Dallas, to appear before this court at trial. Indeed, aside from Tjontveit and a representative of DNB, this court could compel the attendance only of two witnesses—one of Tjontveit's former attorneys and his damages expert. Like the United States, Norway, Germany, Sweden, Spain, and the United Kingdom are signatories to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Conventions") March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, codified at 28 U.S.C. § 1781. *See* Martindale–Hubbell, *International Law Digest*, at p. IC–15 (1992). Therefore, the courts of Norway have equal access to evidence from the German, Swedish, Spanish, and English witnesses as this court, and have superior access to the Norwegian witnesses. The availability of compulsory process over the ten witnesses living in Norway is of considerable importance. *See Magnin*, 91 F.3d at 1430; *Baumgart*, 981 F.2d at 836; *De Melo v. Lederle Labs.*, 801 F.2d 1058, 1063 (8th Cir.1986); *Automated Marine*, 859 F.Supp. at 268. Among these individuals are key, third-party witnesses, including attorneys who represented Tjontveit and Gjersvik, former officers of Nord, and employees of ABC who allegedly received Tjontveit's payment of the balance of the purchase price for the Air Express stock. Thus, this factor militates strongly in favor of a Norwegian forum.

### 3. *Practical Problems at Trial*

When faced with a *forum non conveniens* question, courts must consider the practical problems that bear on the ease, expense, and expediency of trial. *See Delgado*, 890 F.Supp. at 1368. Because Norwegian law, and possibly English law, applies to this dispute, a trial in Texas would present major difficulties to counsel and to the court. Foreign law would have to be consulted to determine the construction of foreign commercial instruments and statutes, as well as to ascer-

tain the effect of actions taken by foreign courts. This court would be required to determine, based on Norwegian law, such issues as whether Tjontveit's claims have been released and waived, whether the settlement agreement is enforceable or void, whether Tjontveit's claims (which are more than seven years old) are barred by limitations, and whether DNB breached the trust agreement or Tjontveit failed to comply with the payment obligations. In order to craft appropriate jury instructions, access to Norwegian statutes and court decisions would be essential. Reporters and other sources containing these documents are not contained in the library of the Southern District of Texas or on WESTLAW. These sources, no doubt, also are not readily available to Texas counsel. The courts have recognized that problems inherently arise when a court is forced to apply a law with which it is unfamiliar. *See Reyno*, 454 U.S. at 251; *Gilbert*, 330 U.S. at 509; *Magnin*, 91 F.3d at 1430; *Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 880 (5th Cir.1987); *Pain*, 637 F.2d at 793 n. 101. It would be far more practical to try this case in the courts of Norway, which are much better equipped to deal with questions arising under Norwegian law and obviate the need for experts on Norwegian law. *See Schertenleib*, 589 F.2d at 1165. Furthermore, the plaintiff is in a better position with respect to jurisdiction over the defendant in Norway, because DNB has agreed to submit to the jurisdiction of Norwegian courts. In contrast, in view of additional evidence furnished in connection with the parties' submissions on the *forum non conveniens* issue, if this case were to remain in this forum, the court would deem it necessary to revisit the Foreign Sovereign Immunities Act question. Thus, as a practical matter, a *forum non conveniens* dismissal is more advantageous to both parties.

Therefore, the private interest factors weigh heavily in favor of a Norwegian forum. Norway supplies an available and adequate alternative forum, and considerations of the relative ease of access to sources of proof, the availability of compulsory process, the cost of obtaining the attendance of witnesses, and other practical problems occasioned by a trial of this case in the Southern District of Texas mandate the dismissal of this action on the basis of *forum non conveniens*.

### C. *Public Interest Factors*

Although perhaps unnecessary in light of the strength of the private interest factors, an assessment of the public interest factors also favors a *forum non conveniens* dismissal. The public interest factors generally considered in a *forum non conveniens* analysis include: (1) the administrative difficulty flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having a diversity case tried in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems of the conflict of law or the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *See Gilbert*, 330 U.S. at 508–09; *Robinson*, 117 F.3d at 908; *Nowak v. Tak How Invs. Ltd.*, 94 F.3d 708, 719–20 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997).

#### 1. *Choice of Law*

Choice-of-law principles dictate that Norwegian law, or perhaps English law with respect to the Boeing 707 dispute, is applicable to this action—a factor this court considers pivotal in declining jurisdiction. *See Reyno*, 454 U.S. at 260 & n. 29; *Gilbert*, 330 U.S. at 509; *Quintero*, 914 F.2d at 729; *Gonzalez*, 832 F.2d at 879. While this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate, many *forum non conveniens* decisions have held that the need to apply foreign law favors dismissal. *See Reyno*, 454 U.S. at 260 n. 29; *Magnin*, 91 F.3d at 1430; *Calavo Growers of Cal. v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir.1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981); *Schertenleib*, 589 F.2d at 1165.

A conflict of laws analysis in this forum in a diversity case involves weighing the factors set forth in the RESTATEMENT (SECOND) OF CONFLICTS OF LAW (1971) ("Restatement"). *See Maxus Exploration Co. v. Moran Bros.*,

*Inc.,* 817 S.W.2d 50, 53 (Tex.1991); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 678 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *see also Gulf Trading & Transp. Co. v. Vessel Hoegh Shield,* 658 F.2d 363, 366 (5th Cir.1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982). If the choice-of-law provision in the settlement agreement is found to be controlling, Norwegian law, including Norwegian conflict of laws principles, would be applied to both transactions at issue here. *See generally Mitsui,* 111 F.3d at 35. When the parties to a contract have not chosen the law that is to govern their agreement, § 188(1) of the Restatement provides that the rights and duties of the parties are determined by the local law of the state or country that has the most significant relationship to the transaction and the parties. *See Maxus,* 817 S.W.2d at 53; *CPS Int'l, Inc. v. Dresser Indus., Inc.,* 911 S.W.2d 18, 28–29 (Tex.App.—El Paso 1995, writ denied). Section 188 of the Restatement lists the following factors to be considered in analyzing a conflicts question arising from a contract dispute: (i) the place of contracting; (ii) the place of negotiation of the contract; (iii) the place of performance; (iv) the location of the subject matter of the contract; and (v) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See Maxus,* 817 S.W.2d at 53.

In the instant case, the place of contracting and the vast majority of contract negotiations took place in Norway and England. The Air Express stock purchase agreement and the trust agreement were executed in Norway. The Air Express transaction was to be performed in Norway, where the stock in a Norwegian corporation was to be delivered to Nord, a Norwegian corporation, by DNB, a Norwegian bank, but was instead delivered to another Norwegian corporation. The purchase agreement for the Boeing 707 aircraft was executed in England. The aircraft transaction was to occur in England, where a German corporation was to take possession of an aircraft located in England and owned by a Cayman Islands corporation, but DNB, a Norwegian bank, allegedly failed to notify the German corporation of an existing lien on the airplane. Moreover, the settlement agreement was executed and was to be performed in Norway, where the loans at issue were made and the real estate subject to foreclosure is located. In addition, the settlement agreement specifies a Norwegian venue and the application of Norwegian law.

The Restatement also sets forth general principles to be considered in choice-of-law matters, including: (i) the needs of the international system; (ii) relevant policies of the forum; (iii) relevant policies of other interested states; (iv) the protection of justified expectations; (v) the basic policies underlying the particular field of law; (vi) certainty, predictability, and uniformity of result; and (vii) ease in the determination and application of the law to be applied. *See Arochem Corp. v. Wilomi, Inc.,* 962 F.2d 496, 499 (5th Cir.1992). A Norwegian court has a greater interest in resolving the present dispute than a Texas court. There is no overriding American interest in providing a home forum for this type of controversy. Rather, in this case, where two Norwegian corporations negotiated and executed a contract in Norway to transfer stock held in a Norwegian company, DNB could not justifiably expect to be sued in the United States in connection with its role as escrow agent. Similarly, in the Boeing 707 matter, involving an agreement executed in England between a German corporation and a Cayman Islands corporation, DNB could not justifiably expect to be sued in the United States with regard to a lien it held on the aircraft.

Tjontveit, however, could have reasonably expected to litigate these matters in Norway, due to DNB's role in both of these disputes as well as the fact that the settlement agreement, which contains a Norwegian forum selection clause and choice-of-law provision, concerns real property located in Norway and loans that were made there. "In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere." *Mizokami Bros. of Ariz., Inc. v.*

812

*Baychem Corp.,* 556 F.2d 975, 978 (9th Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978). The policies and interests of the governments of Norway and the United States are best served by requiring that this dispute be resolved in the country where it arose. It is more appropriate to hold a trial "in a forum that is at home with the . . . law that must govern the case, rather than having a court in some other forum untangle problems in conflicts of laws, and in law foreign to itself." *Gilbert,* 330 U.S. at 509. Norwegian courts are clearly more able to locate, interpret, and apply Norwegian law to this action than is this court. "Far better that this case be tried in [Norway] by one or more jurists as familiar with [Norwegian] law as we are unfamiliar with it." *Magnin,* 91 F.3d at 1430. Therefore, the choice-of-law factor weighs heavily in favor of the selection of a Norwegian forum. *See Gilbert,* 330 U.S. at 509; *Magnin,* 91 F.3d at 1430; *Quintero,* 914 F.2d at 729; *Pain,* 637 F.2d at 793 n. 101.

### 2. Local Interest

The citizens of this district and of the United States have little interest in the outcome of these seemingly routine, European commercial disputes. Norway is the country with strong local interests in this controversy. The majority of events relating to this action occurred in Norway, and that is where Nord and Tjontveit were arguably damaged. Because Norwegian law, or perhaps English law, applies, the decision in this case would have no precedential impact in the United States. Even in an action filed by an American citizen in his own right, the courts have not hesitated to dismiss a complaint *forum non conveniens* where, as here, a danger of injustice, oppression, or vexation is found. *See Scottish Air,* 81 F.3d at 1232. In this instance, almost identical claims were asserted by Tjontveit in the Norwegian Conciliations, and there is already an ongoing Norwegian legal proceeding between the parties. The same issues raised in this action were raised by Tjontveit as defenses to the foreclosure proceedings. It is apparent that the disputes between DNB and Tjontveit are longstanding and have been pending in the Norwegian judicial system for several years. In view of these facts, as well as Tjontveit's

apparent disaffection for the Norwegian courts, the selection of this forum, which has no apparent relationship to any of the parties or events at issue, smacks of improper forum shopping. *See Odeco Oil & Gas Co. v. Bonnette,* 4 F.3d 401, 404 (5th Cir.1993), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1370, 128 L.Ed.2d 47 (1994); *Spar, Inc. v. Information Resources, Inc.,* 956 F.2d 392, 395 (2d Cir. 1992); *Nationale Co-Operatieve Zuivelverkoopcentrale W.A. v. M/V EFTIHIA,* No. 91–2541, 1992 WL 69870, at *3–4 (E.D.La. Mar.23, 1992). Indeed, Tjontviet does not even reside in this district, but in the Northern District of Texas, where most of his Texas witnesses reside. In any event, the pendency of related litigation in an alternate forum is an important consideration in a *forum non conveniens* analysis. *See Kultur,* 860 F.Supp. at 1068; *Wartsila,* 159 B.R. at 994; *Fassi,* 753 F.Supp. at 491. "That similar actions are pending in [Norway] does not deprive this court of jurisdiction, but it does suggest that this action could proceed conveniently in [Norway]." *Id.*

There are no significant interests that would be furthered by this court's adjudication of this primarily foreign dispute. *See Scottish Air,* 81 F.3d at 1233–34. The incremental deterrence that might be gained if DNB were held liable in Texas as opposed to Norway is likely to be inconsequential. The American interest in this controversy is negligible and is insufficient to justify the commitment of judicial time and resources that would inevitably be required if the case were to be tried here. *See Reyno,* 454 U.S. at 260–61; *Quintero,* 914 F.2d at 729.

### 3. Burden to the Courts and to the Community

The courts of this district are congested with cases having far greater ties to Texas and to the United States than this dispute. At present, the Southern District of Texas has several judicial vacancies, and each sitting judge has a heavy caseload. The demands of a sizable criminal and prisoner docket and the priority given to criminal cases leads to an inevitable backlog of civil cases. Therefore, the conservation of judicial resources is an important objective, as it

enhances the efficient and just resolution of the numerous cases in which this is the only appropriate forum. This objective is better served by this court's dismissal of the instant case. It is not in the public interest to further encumber this docket with cases that have only a minimal connection to and no precedential impact upon the local community. *See Seguros,* 933 F.Supp. at 1314 (citing *Cuevas v. Reading & Bates Corp.,* 577 F.Supp. 462, 476 (S.D.Tex.1983), *aff'd,* 770 F.2d 1371 (5th Cir.1985)).

Furthermore, it would be an undue burden upon the citizens selected for jury duty to devote their time and attention to deciding this case rather than the many cases with a more compelling relationship to local interests. The burden of jury duty should not be imposed upon the residents of a community with no relationship to the parties or issues involved in a case. *See Gilbert,* 330 U.S. at 508–09; *Quintero,* 914 F.2d at 730–31. In addition, it would be difficult for a Texas jury, with no familiarity of Norwegian or English commercial practices and customs, to understand and apply Norwegian or English law to resolve Norwegian and English commercial disputes. As the Supreme Court observed in *Gilbert:*

> Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home.

330 U.S. at 508–09; *see Robinson,* 117 F.3d at 908. In contrast, "[t]he defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens." *Reid–Walen v. Hansen,* 933 F.2d 1390, 1400 (8th Cir.1991). "Any economic burden to the forum is justified because the defendant has undertaken both the benefits and burdens of citizenship and of the forum's laws." *Id.*

The central question a court must answer when considering the public interest is whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it. *See Pain,* 637 F.2d at 791; *Seguros,* 910 F.Supp. at 1249. This court's examination of the public interest considerations indicates that no such nexus exists here. There appears to be little or no public interest in this dispute, questions of foreign law predominate, and the retention of jurisdiction would be burdensome to the court and to the community. *See Air Crash Disaster,* 821 F.2d at 1165–66; *Pain,* 637 F.2d at 792. Thus, the interests of the public are furthered by this court declining to exercise jurisdiction in this case.

### III. *Conclusion*

Accordingly, this court finds that the interests of both the parties and the public are better served by dismissing the instant action on the basis of *forum non conveniens.* The courts of Norway provide an available, adequate, and more appropriate forum for the resolution of this dispute.

Therefore, it is ORDERED that this case is dismissed under the following conditions:

1. Tjontveit may refile his case in a court of competent jurisdiction in Norway within ninety (90) days of the date of this Order;

2. DNB shall submit to the jurisdiction of the appropriate Norwegian court in which Tjontveit files suit;

3. DNB shall waive any statute of limitations or jurisdictional defenses that could be posed in the Norwegian court;

4. The parties shall be bound by all discovery conducted in this case in the Norwegian proceeding;

5. DNB shall make available in Norway all relevant documents and witnesses within its control;

6. DNB shall exercise its best efforts to expedite a trial setting in the Norwegian proceeding, including having its attorneys accept service on its behalf or waiving the initial service requirements under the applicable law; and

**814**

7. DNB shall agree to satisfy any final judgment rendered by the Norwegian court.

This Order of Dismissal shall become final if (1) Tjontveit fails to file suit in Norway within ninety (90) days from the date of this Order or (2) if this action is timely filed in Norway, DNB complies with all the conditions of this Order by filing a stipulation to that effect, and the Norwegian court accepts jurisdiction. Within ten (10) days after the expiration of the ninety (90) day period, the parties shall advise this court whether Tjontveit filed suit in Norway and, if so, whether the Norwegian court accepted jurisdiction.

Accordingly, subject to the conditions stated above, DNB's motion to dismiss for *forum non conveniens* is GRANTED.

IT IS SO ORDERED.